# Price v. Commonwealth.

June 15, 1943.

E. B. Rose and H. L. Rudd for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

At the June, 1942, term of the Owsley circuit court the grand jury returned an indictment against appellant, charging him with the murder of Melvin Hall. He was convicted of manslaughter and sentenced to seven years in the penitentiary. In the motion and grounds for a new trial and in brief of appellant, numerous alleged errors are set out and insisted on for reversal of the judgment. The indictment charged, in substance, that appellant killed and murdered Hall, the deceased, by striking and wounding him on the head, body and limbs with some kind of deadly weapon and by knocking or pushing him from the bridge across the river at Beattyville, Kentucky, and from which striking or wounding or forcing from the bridge, or by a combination of the means, which

one, or the exact manner being unknown to the grand jury, Hall died; that the wounding and injury occurred in Lee county, Kentucky, but Hall died in Owsley county, Kentucky.

On Saturday, April 4, 1942, Hall, who lived in Owsley county, went to Beattyville and, while there in company with other companions, he became intoxicated. One of his companions, or someone present in the whiskey store where they were purchasing and drinking whiskey, laid a $10 bill on the counter to pay for some whiskey and Hall snatched the bill and ran away with it. Virgil Smith, the chief of police of Beattyville, was called and when he arrived at the scene Hall first denied that he got the money but later he accompanied Smith to the place where he had hidden it and Smith returned the money to the owner. Smith then told Hall that he was intoxicated and advised him to go home, which he promised to do. This occurred about 7 p. m. About three hours. later Smith found Hall drunk at a restaurant in Beattyville and told him he would have to take him to jail and he placed him in his, Smith's, automobile and drove him to the city jail. Smith got out at the left side of the car and Hall, who was seated at Smith's right, got out at the other side of the car and ran around the jail and down the creek bank and waded across the creek and made his escape. Smith watched for him awhile about the street and at the point where he had crossed the creek, and then drove up the street to the upper end of town and there he found appellant, who was also a policeman of Beattyville. Smith told appellant of Hall's escape and took appellant to a point near the approach of the bridge across the river and instructed him to watch for Hall and if he found him to arrest him and bring him to jail. Smith then drove about over the town looking for Hall but failed to find him. Appellant remained at or near the approach of the bridge for some time keeping a lookout for Hall, during which time he saw and talked to various persons passing along the street and over the bridge. An automobile stopped at the intersection of the street near the bridge and someone got in it and the automobile then went on toward the bridge. Appellant attempted to stop the automobile but the driver refused to stop and drove around appellant and across the bridge and on toward Owsley county. Another automobile came along and appellant stopped it and got in it and asked the driver to overtake the automobile which

had crossed the bridge but they were unable to overtake it. When they reached a junction of the road at the other side of the bridge, they saw another automobile going down another road and investigated it but failed to find Hall in it. They then started back toward Beattyville and saw another car on a side road and investigated it but failed to find Hall. Appellant then drove some of his companions to their homes and then drove on back to Beattyville and after the saloons and places of business had closed at 11 o'clock, he and others went down the river about one-half mile from the bridge to some fish boxes and got some fish and then went to his home and had a fish fry, and his companions left him at his home at about 2 o'clock in the morning.

On the following morning, Charles Sale, Jr., found Hall lying on the river bank just above and almost under the bridge and awakened him, and Hall told him to go away that he wanted to sleep. About two hours later Tip Wilson and Fay Fraley were coming down the river in a boat and saw Hall lying on the river bank at the point where Sale had previously found him and they awakened him and asked him what was the matter with him and he told them that he did not know but that his back was hurt. Fraley asked him if someone had hurt him or if he fell off the bridge and he said he was drunk and did not know what had happened. They called Smith, the chief of police, who came to the scene and took Hall to Dr. Evans' office in Beattyville and he was again asked how he had been hurt and he said he did not know what happened or how he got hurt. He made this statement to a large number of witnesses at different times and places while he was in Beattyville, and also after he had been taken to his home in Owsley county. Another witness testified that he left Beattyville at about 11 o'clock and while crossing the bridge referred to on his way home, a few minutes after 11 o'clock, he saw Hall on the bridge and he seemed to be very drunk. Fred Howerton and his wife Lena Howerton testified that they were in Beattyville on that night and left town at 11 o'clock and on their way home, while crossing the bridge referred to, they saw a man standing outside the bridge railing sticking his head through the railing or bannisters at about the point where Hall was found under the bridge. It was shown in the evidence that near the place where Hall was found a sill of the bridge projected out about eighteen inches, and also a guy wire and a root

·or snag of a tree, which might indicate that if Hall fell from the bridge he fell on one of these objects which resulted in the injury to his back from which he died.

A few days after Hall was taken to his home in Owsley county he was taken to a hospital in Richmond, Kentucky, where he stayed several days, and was then taken to a hospital in Lexington. After medical treatment the doctors were of the opinion that he could not recover and he was taken back to his home in Owsley county. On the trial of the case, Crit Hall and Lizzie Hall, father and mother of the deceased; his widow, Mrs. Nannie Hall, and brother, Alfred Hall, testified that after deceased was brought back to his home from the Lexington hospital on the day before he died he said that he had given up and could not live any longer. Mrs. Nannie Hall said that he made the statement that "Red Price did it." The other witnesses testified to similar statements, one of them saying that he said that "Red had killed him away from his family," and that "Red Price struck him in the back." Aside from the dying declaration of Hall, there is barely a scintilla of evidence conducing to show that appellant assaulted Hall or even saw him on that night after Smith, the Chief of Police, took him from the restaurant and started to the jail with him.

For the purpose of contradicting the dying declaration of Hall, appellant sought to prove by C. A. Bowman, Judge of Owsley county, that on April 10, 1942, after Hall had been brought back to his home from the hospital, he stated to Judge Bowman that he did not know who or what had hurt him. Judge Bowman testified in part as follows:

"Q. Did you know Melvin Hall in his lifetime, Judge Bowman? A. Yes, sir.

"Q. After he had been injured and returned from the hospital did you have a conversation with him? A. Yes, I took his deposition after they brought him out to Booneville, I took it first and then I think it was the next afternoon he sent for me and I took it again.

"Q. Judge Bowman, I will ask you if on the first occasion when you saw him if you asked him what had hurt him? A. I did.

"Q. What did he say in response to that question? A. He said he didn't know what had hurt him.

"Q. At that time, Judge Bowman, was he conscious in your judgment and in the full possession of his mental faculties? A. Yes, he seemed to be.

"Q. On that occasion he seemed to be in full possession of his mental faculties and to know what he was doing? A. Yes, he did.

"Q. And he told you then that he didn't know what had hurt him? A. Said he did not know."

Counsel for the Commonwealth interceded and asked the witness if Hall's statement was put in writing and the witness answered in the affirmative and counsel for the Commonwealth then objected to the witness testifying orally and asked that the written statement be introduced or read to the jury. Judge Bowman then said, in substance, that he took a statement from Hall on the morning of April 10 and on the next afternoon, April 11, Hall sent for him to come back to his home—that he wanted to make another statement—and he and the sheriff of Owsley county went to where Hall was and took a second statement. In each statement Hall said he did not think he was going to die. On cross-examination counsel for the Commonwealth then asked the witness to read both statements to the jury, to which counsel for appellant objected. The court overruled the objections and permitted both statements to be read to the jury but admonished the jury that they would consider the statements only for the purpose of contradicting the dying declaration, if they did so contradict it, and for no other purpose. In the first statement, dated April 10, which counsel for appellant sought to introduce, Hall was asked and answered these questions:

"Q. Do you know who hurt you? A. No.

"Q. Where did you get hurt? A. On the North Fork Bridge.

"Q. Before you got hurt do you remember seeing any one? A. Yes, I saw somebody. Looked like blue suit of clothes on.

"Q. Do you remember any one striking you? A. Yes, I can remember getting hit but I was out so quick that I couldn't tell who it was."

In the second statement, dated April 11, he was asked and answered these questions:

"Q. What is wrong with you? A. I have been hit and killed.

"Q. Do you believe you are going to die? A. No, sir, I don't.

"Q. Who hit you? A. Red Price.

"Q. What caused him to hit you? A. I do not know.

"Q. Where did this happen? A. In Beattyville, Kentucky, near the end of the North Fork Bridge.

"Q. When did this happen? A. Last Saturday night, about 10 o'clock.

"Q. What did he hit you with? A. I don't know, something mighty heavy."

After counsel for appellant sought to and did prove a part of the statements made by Hall on April 10, the Commonwealth then had the right to have the whole statement read to the jury or to prove all that Hall said in that statement on that particular occasion. Meadors v. Commonwealth, 281 Ky. 622, 136 S. W. (2d) 1066. It is insisted in brief of the Commonwealth that appellant cannot now complain concerning the introduction of the written statements testified to and introduced by Judge Bowman since he, appellant, first introduced them and attempted to prove a part of what Hall said and, therefore, the Commonwealth had the right to have all that was said in the statements introduced, citing the Meadors case, supra. This is correct as to the first statement, the only one which appellant attempted to introduce, but the second statement does not come within that category since counsel for appellant did not attempt to introduce it or to prove any statement made therein by Hall. It was brought into the evidence by the Commonwealth and over the objections of appellant. There is also cited in brief of Commonwealth in support of its contention, the case of Blackerby v. Commonwealth, 200 Ky. 832, 225 S. W. 824. In that case two written statements were made by the deceased in regard to the homicide, one on the night of December 18 and one on December 23. The latter was admitted as a dying declaration, but the for-

mer was excluded on the ground that it was not made under a sense of impending dissolution. After the second statement was admitted, the defendant was permitted to introduce a portion of the first statement for the purpose of impeaching the other one. The court then permitted the Commonwealth to introduce the whole of the first statement under the rule that where a party seeks to impeach a witness by the introduction of a portion of a former conversation, statement or deposition, the opposing party may then introduce the whole of the former conversation, statement or deposition. It is to be noted, however, that in the present case appellant did not attempt to prove by the witness, Judge Bowman, any part of the second statement, which was made April 11, in which Hall stated that appellant had injured him. This statement was independent of the previous one, attempted to be proven by appellant. We think the court erred in permitting the second statement to be read to the jury, or any evidence given concerning it.

It is further insisted for appellant that the court erred in giving the jury a voluntary manslaughter instruction, the one under which appellant was convicted, and also erred in failing to give an "officer's instruction" setting out the rights and duties of an officer in making an arrest and the duties of the person sought to be arrested to submit thereto. Since no witness saw or testified as to how Hall received his injuries except his own statement that appellant assaulted him, and in view of all the physical facts and surrounding circumstances, we do not think that the court erred in giving the voluntary manslaughter instruction. Nor do we think that appellant was entitled to an officer's instruction, since he does not claim that he attempted to arrest Hall but claims he was not present when Hall was injured and does not know how his injury came about.

Lastly, it is insisted that since there is no evidence of a probative or substantial nature tending to connect appellant with the injury or death of Hall, except the dying declaration proven by the members of his family, and in view of the many contradictory statements Hall made previous to the making of his dying declaration, in the circumstances the dying declaration was practically destroyed as evidence and at the most does not amount to more than a scintilla and for that reason the court should have peremptorily instructed the jury to find a verdict for the defendant. Since, however, the case must

be reversed because of the error committed in introducing to the jury the second statement Hall made to Judge Bowman on April 11, we express no opinion as to the sufficiency of the evidence to take the case to the jury, which question is expressly reserved.

Because of the error indicated, the judgment is reversed and remanded for proceedings consistent with this opinion.